**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**SANDERSON FARMS, INC.**                                                            **PLAINTIFF**

        **v.**            Civil No. 04-5175

**ARVEST BANK**                                                                       **DEFENDANT**

**O R D E R**

Now on this 14th day of September, 2005, come on for consideration **Arvest Bank's Motion For Summary Judgment** (document #34) and the **Motion For Partial Summary Judgment Of Plaintiff, Sanderson Farms, Inc.** (document #37), and from said motions, the supporting documentation, and the responses thereto, the Court finds and orders as follows:

1. In this diversity suit, plaintiff Sanderson Farms, Inc. ("Sanderson") sues to recover $700,000 from the deposit account of Sams Management Group ("Sams"), which it claims was wrongfully set off by defendant Arvest Bank ("Arvest") against debts owed to Arvest by Sams.  Sanderson claims that the set-off amounted to conversion by Arvest of Sanderson's property, or the property of its buyer (and assignee) Euroservice.  Sanderson also claims that Arvest tortiously interfered in its contract with Sams.  It seeks money damages and equitable remedies in the form of the imposition of a constructive trust on the $700,000 now in the hands of Arvest and the requirement that Arvest engage in marshaling of Sams' assets in its attempt to collect Sams' debts to Arvest.

Arvest seeks summary judgment in its favor as to all claims brought by Sanderson. Sanderson, for its part, seeks summary judgment in its favor only on its conversion claim.

2. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States**, **31 F.3d 696 (8th Cir. 1994)**. Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. **Hardin v. Hussmann Corp.**, **45 F.3d 262 (8th Cir. 1995)**. The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. **City of Mt. Pleasant, Iowa v. Associated Electric Co-op**, **838 F.2d 268 (8th Cir. 1988)**.

3. Pursuant to **Local Rule 56.1**, the parties have filed statements of facts which they contend are not in dispute. From those statements, and the pleadings of the parties, the following significant undisputed facts are made to appear:

\* Sanderson is a Mississippi corporation with its principal place of business in Laurel, Mississippi. It sells

poultry products.

* Arvest is an Arkansas banking corporation with its principal place of business in Fayetteville, Arkansas.

* Sams is an Arkansas corporation located in Rogers, Arkansas, which serves as an agent or broker for poultry sales to Russia and Eastern Europe.

* In November, 2001, Arvest made an SBA-guaranteed loan (the "SBA Note") to Sams in the amount of $1,110,500. A copy of the SBA Note was submitted by Arvest as an exhibit to its motion, and the authenticity of this document is not challenged.

* To secure the SBA Loan, Sams executed three Security Agreements in favor of Arvest. One Security Agreement covered accounts and other rights to payment, another covered inventory, and a third covered general intangibles. Copies of these Security Agreements were submitted as exhibits by Arvest, and their authenticity is not challenged.

* Sams also agreed, in connection with the SBA Note, to maintain a minimum of $1,000,000 in equity.

* The SBA Note provided that a failure to do anything required by the SBA Note or "other loan documents" constituted a default, as did "any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note."

* The SBA Note provided in relevant part that, upon

default, Arvest could, without notice or demand, require immediate payment of all amounts then due under the Note, and take possession of any collateral.

* Arvest perfected its security interest in Sams' accounts and other rights to payment, inventory, and general intangibles by filing a Financing Statement covering the Security Agreements with the Arkansas Secretary of State on November 30, 2001.

* In August, 2002, Sams gave Arvest a promissory note (the "Letter of Credit Note") in the sum of $750,000, to fund a Letter of Credit issued for the benefit of Sanderson. A copy of the Letter of Credit Note was submitted by Arvest as an exhibit to its motion, and the authenticity of this document is not challenged.

* Like the Security Agreements associated with the SBA Note, the Letter of Credit Note gave Arvest a security interest in Sams' inventory, accounts and other rights to payment, and general intangibles of Sams.

* The Letter of Credit Note defined default to include "default on any other debt or agreement" Sams had with Arvest; a "material change" in Sams' business or financial conditions; and situations where Arvest "reasonably believe[s]" that it is insecure.

* The Letter of Credit Note gave Arvest the right to set off "any amount due and payable under the terms of this Loan Agreement against any right I have to receive money from you."

*   The Letter of Credit Note also provided that in the event of default, the holder could elect to declare the entire unpaid balance immediately due and payable without notice.

*   In October, 2002, pursuant to a Contract between Sams and Maplehurst Overseas Ltd. ("Maplehurst"), a shipment of poultry products (the "Shipment") was loaded on the M/V Minnesota, bound for delivery in St. Petersburg, Russia. Although the Contract does not so state, the poultry was supplied by Sanderson, which held the bills of lading on the Shipment in its name, and was the insured on the maritime insurance policy covering the Shipment.

*   Until November 13 or 14, 2002, it was the understanding and expectation of Sams and Sanderson that Maplehurst (or a business known as Euroservice -- the parties refer to these two entities interchangeably) was to pay the price of the Shipment by wire transfer directly to Sanderson's account at AmSouth Bank prior to delivery in St. Petersburg.

*   Despite this agreement, Maplehurst (or Euroservice) made several payments on the Shipment to Sams' account at Arvest in the sum of $318,000 on October 18, 2002, and $150,000 on October 24, 2002. Of this, $368,000 was remitted to Sanderson.

*   On or about November 6, 2002, Sams furnished Arvest with a balance sheet stating that as of October 31, 2002, its total equity was $1,032,487.49.

* On November 7, 2002, Sams informed Arvest that payment for the Shipment would be made directly to Sanderson. Arvest insisted that the payment be made to Sams instead, taking the position that the payment was a Sams' receivable in which it had a security interest.

* Employees of Arvest and Sanderson communicated about payment for the Shipment, Sanderson taking the position that the payment was Sanderson's money, Arvest taking the position that it was a Sams' receivable.

* On November 8, 2002, Sanderson presented Arvest with a sight draft in the amount of $750,000 on the Letter of Credit. Arvest paid this draft, thereby funding the Letter of Credit Note.

* As a result of the payment made by Arvest to Sanderson, Sams' equity fell below $1,000,000. This amounted to a technical default on the SBA Note. It also led Arvest to reasonably believe that Sams had experienced an adverse change in financial condition that would affect Sams' ability to repay its debts to Arvest.

* On November 12 and 13, 2002, Maplehurst/Euroservice made payments to Sams' account at Arvest in the sum of $500,000 and $100,000, respectively, on the Shipment.

* On November 20, 2002, Arvest set off $667,286.24 from that account against Sams' indebtedness to Arvest. On December 3, 2002, Arvest set off an additional $71,546.64 from that account.

* Before the set-offs, Arvest had actual knowledge that

Sanderson claimed to hold the bills of lading on the Shipment, and claimed that proceeds of sale of the Shipment belonged to Sanderson.

\*   The Shipment remained in limbo until December 27, 2002, when Euroservice finally obtained possession by paying the unpaid portion of the purchase price and assigning all rights and claims it had against Sams and Arvest to Sanderson.

4.   Both Sanderson and Arvest claim the right to judgment in their favor on the conversion issue. The Arkansas Supreme Court has explained that

> [t]o establish liability for the tort of conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owners' rights.  Where the defendant exercises control over the goods in exclusion or defiance of the owner's rights, it is a conversion, whether it is for defendant's own use or another's use. . . .[C]onscious wrongdoing is not the requisite intent for conversion; rather, what is required is that there be intent to exercise control or dominion over the goods.

**McQuillan v. Mercedes-Benz Credit Corp.**, **331 Ark. 242, 961 S.W.2d 729 (1998)**(internal citations omitted).

The property in question here is payment for the Shipment, and the pivotal issue is, who had the "better right" to receive that payment, Sanderson or Sams (since Arvest acquired the money by set-off after it was deposited to Sams' Arvest account)?

5.   In support of its argument that it had the better right to receive payment for the Shipment, each party relies on its own

-7-

version of the business transaction that involved Sanderson, Sams, and Maplehurst/Euroservice.

* Arvest takes the position that the transaction was a consignment, i.e., that Sanderson consigned the goods to Sams; Sams sold the goods to Maplehurst; Maplehurst owed the full price of the Shipment to Sams; and Sams owed Sanderson a portion of that money to pay for the goods. Under that scenario, the payment owed by Maplehurst to Sams was an account receivable of Sams, in which Arvest had a perfected security interest.

* Sanderson takes the position that Sams, acting as its agent, negotiated a deal whereby Sanderson would sell the goods directly to Maplehurst. In this version, Sams negotiated the contract and made the shipping arrangements, but this was all done on behalf of its undisclosed principal, Sanderson. Sanderson then issued bills of lading which created a security interest in Sanderson.

6. Tending to support the scenario posited by Arvest is the fact that the contract for sale of the goods -- dated October 15, 2002 -- was between Maplehurst and Sams. Sanderson is not mentioned. Sams is identified as the "seller," and payment was to be made "to the account of the seller or to the account specified by the seller beforehand."

Also tending to support Arvest's position is the fact that until July, 2002, Sanderson had made "consignment sales" to Sams.

Sanderson claims to have changed its method of doing business at that point so that thereafter. "all payments were to be made directly to Sanderson Farms,"[1] yet Maplehurst/Euroservice made payments on the Shipment directly to Sams in the sum of $318,000 on October 18, 2002, and $150,000 on October 24, 2002, without creating any apparent problems between Sams and Sanderson.

Under the U.C.C., a consignment does not "create a security interest that secures an obligation."[2] **A.C.A. §4-9-102(a)(20)**. Thus, if there was a consignment of goods by Sanderson to Sams, no security interest was created in Sanderson, the payment was a receivable of Sams, and the Arvest Financing Statement would entitle Arvest to priority in the proceeds of the sale.

7. Tending to support the scenario posited by Sanderson, there is evidence that the change from consignment to direct sales had occurred. Sanderson points out that it held the charter on the M/V Minnesota and the bills of lading. It could, therefore, divert the ship to another port and sell the cargo to another buyer, regardless of any conduct of Sams.

Sanderson also points out that Sams' invoices dated October 14, 2002; October 17, 2002; October 22, 2002; October 28, 2002[3],

---

[1] Memorandum of Authorities of Plaintiff, Sanderson Farms, Inc., In Opposition to Arvest Bank's Motion for Summary Judgment, page 4.

[2] There are other criteria for a consignment, but they are not relevant to the analysis here, and so the Court has not included them.

[3] There are actually two invoices with this date, one directing Euroservice to wire payment to Sanderson, the other directing payment to Sams. The invoice directing payment to Sams was clearly created after shipment, however, as it indicates receipt of

all directed Euroservice to wire payment to Sanderson, and that two communications from Sams to Euroservice on October 24, 2002, directed Euroservice to wire payment to Sanderson. It argues that this evidence indicates that Sanderson was the direct seller of the product, rather than having consigned it to Sams for sale.

It also argues that it held negotiable bills of lading, which gave it a security interest prior to that of Arvest pursuant to **A.C.A. §4-2-505** and **§4-9-110**. The negotiability argument, however, relies on the language of the Charter Party; the bills of lading themselves are not payable to bearer or to order.

8. As can be seen, the evidence is contradictory, and were either party the sole movant on the issue, the Court would be required to grant all favorable inferences in favor of the other. The business transaction appears to be a mixture of the scenario posited by each party, possibly stemming from the fact that the business relationship between Sams and Sanderson was in transition at the time of the events in dispute. The Court concludes that genuine issues of material fact are in dispute about the transaction, and that the issue of conversion is inappropriate for summary judgment. Both motions will, therefore, be denied to the extent they address that issue.

9. Arvest also argues that, to the extent Sanderson seeks to assert rights assigned to it by Maplehurst/Euroservice, it

---

pre-loading payments.

seeks to assert an action sounding in tort, which cannot, under Arkansas law, be assigned. That is indeed the law in Arkansas, **Mallory v. Hartsfield, Almand & Grisham, LLP, 350 Ark. 304, 86 S.W.3d 863 (2002),** and Sanderson appears to concede as much, not having addressed the argument. Arvest's motion will, therefore, be granted insofar as it seeks summary judgment on this claim.

10. Arvest also contends that it is entitled to summary judgment on Sanderson's claim of tortious interference with contract. The thrust of its argument is that it had a security interest in Sams' receivables, and therefore any interference it might have caused between Sams and Sanderson was not "improper," as must be shown to prove a tortious interference claim. This claim thus turns on the same disputed facts relevant to the conversion claim, and summary judgment on it must be denied for the same reasons.

11. Finally, Arvest contends that Sanderson is not entitled to any form of equitable relief. It points out that it held the first mortgage on certain real property, and that the issue of mortgage priority has been litigated in the Circuit Court of Benton County, Arkansas.

Sanderson does not deny that Arvest holds the first mortgage on the secured property, but points out that marshaling addresses a different aspect of the security issue. "The marshaling of assets is an equitable principle through which the assets and

securities of a debtor are resorted to or apportioned in such a manner as to secure protection to the rights of each of two or more creditors, or of a creditor and some person other than a creditor having an interest in such assets and securities." **Marsh v. National Bank of Commerce of El Dorado**, 37 Ark. App. 41, 822 S.W.2d 404 (1992). The Court is not persuaded that the marshaling remedy is precluded by *res judicata*.

With regard to the request for imposition of a constructive trust on the proceeds of the sale of the Shipment, Arvest reargues its position on the conversion issue, and in addition contends that there was no confidential relationship between it and Sanderson, so as to support a claim for a constructive trust.

The Court does not believe it to be undisputed that Arvest had no relationship with Sanderson sufficient to support a constructive trust. Under Arkansas law, a constructive trust "is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." **Cox v. Miller**, --- Ark. ---, --- S.W.3d ---, 2005 WL 1484779 (2005).

> Arkansas recognizes that if money
>
> . . . is placed in a bank for the purpose of safekeeping or on an understanding that the bank shall act as bailee or deliver the money under certain circumstances or to apply it to special purposes, or where the deposit is made under circumstances such as to give rise to a necessary implication that it was for such purposes, the deposit is a special deposit and the bank is merely an

>     agent or bailee with no right to use, dispose or permit
>     a disposition of the deposit except pursuant to the
>     terms of the agreement.

**Lasley v. Bank of Northeast Arkansas, 4 Ark. App. 42, 627 S.W.2d 261 (1982).** While it is "axiomatic that one cannot be held liable as an escrow agent or trustee unless he has expressly, or by necessary implication, agreed to act as such and is aware of the terms under which the deposit has been made and the conditions upon which it may be released," *id.*, a finder of fact could conclude from the evidence before the Court that Arvest was aware that payment for the Shipment belonged to Sanderson, not to Sams, before it set off the funds against Sams' debt. If such a conclusion were to be reached, the predicate for imposition of a constructive trust would have been laid.

Summary judgment will therefore be denied as to Sanderson's claims for equitable relief.

**IT IS THEREFORE ORDERED** that **Arvest Bank's Motion For Summary Judgment** (document #34) is **granted in part and denied in part.**

The motion is **granted** insofar as it seeks summary judgment on Sanderson's assertion of the tort claim assigned to it by Maplehurst/Euroservice. The motion is **denied** in all other respects.

**IT IS FURTHER ORDERED** that the **Motion For Partial Summary Judgment Of Plaintiff, Sanderson Farms, Inc.** (document #37) is

**denied.**

**IT IS SO ORDERED.**

                                                         <u>**/s/ Jimm Larry Hendren**</u>
                                                         **JIMM LARRY HENDREN**
                                                         **UNITED STATES DISTRICT COURT**